**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**ANDERSON/GREENWOOD DIVISION**

| | |
|---|---|
| Lakeshia Butler *as Personal Representative of the Estate of Lason Butler*,<br><br>　　　　　　Plaintiff,<br>　　v.<br><br>Richland County, Shane Kitchen, Maurice Callahan, Lance Coleman, Curtis Bufford, Kevin McCollough, Felipe Milhouse,<br><br>　　　　　　Defendants. | Case No. 8:22-cv-2541-RMG<br><br><br>**ORDER AND OPINION** |

Before the Court is the Report and Recommendation ("R&R") of the Magistrate Judge recommending that Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 80) be denied and Defendants' Motion for Summary Judgment (Dkt. No. 81) be granted in part and denied in part (Dkt. No. 95). Defendants responded to Plaintiff's motion (Dkt. No. 85), and Plaintiff replied (Dkt. No. 91). Plaintiff responded to Defendant's motion (Dkt. No. 86), and Defendant replied (Dkt. No. 90). Both parties objected to the R&R (Dkt. Nos. 99, 100), both parties replied to the objections (Dkt. Nos. 101, 102), and both parties replied to the replies (Dkt. Nos. 104, 105). For the reasons set forth below, the Court adopts the R&R in part as the Order of the Court, denying Plaintiff's motion and granting in part and denying in part Defendants' motion (Dkt. No. 95).

## I.　　Background

This case arises out of the death of Lason Butler ("Lason"), a 27-year-old male, during his detention as a pretrial detainee at the Alvin S. Glenn Detention Center ("ASGDC") in Columbia, South Carolina. The Court adopts the Magistrate Judge's factual summary. (Dkt. No. 95 at 1-22). On January 31, 2022, Lason allegedly failed to stop for a blue light, was involved in a motor vehicle crash, taken to the hospital, and then to ASGDC. (Dkt. No. 81-2 at 5). Lason was charged

1

with Failure to Stop for a Blue Light, Driving Under Suspension, and Reckless Driving. (Dkt. No. 81-2 at 2-4). Initially, Lason was classified as general population housing but was subsequently classified as Special Housing Unit ("SHU"). (Dkt. No. 81-3 at 5, 10).

While in the SHU, Lason behaved erratically. He was seen on the floor barking like a dog (Dkt. No. 81-3 at 8), appeared "Floridly Psychotic" (*id.*), and he was "being non-verbal and uncommunicative" (*id.* at 9). Captain Bufford, the security director at ASGDC, observed Lason's behavior and asked Laurrinda Saxon ("Saxon"), a mental health coordinator employed by Wellpath, LLC ("Wellpath"), for Lason to be seen by mental health staff. (Dkt. No. 81-6). On February 10, 2022, Captain Bufford emailed Lieutenant McCollough, a watch commander, similar instructions and directed him to have Lason's cell cleaned. (Dkt. No. 86-17). On February 11, 2022, Saxon scheduled Lason to be seen by psychiatrists but was told that Lason would not get dressed to be transported to medical for his appointment. (Dkt. No. 81-4). Allegedly, Nurse Davila went to check on Lason with Sergeant Callahan, but Sergeant Callahan refused to open the cell door for security reasons because there was inadequate staffing on the floor. (Dkt. No. 81-8). When Officer Milhouse took over Sergeant Callahan's post, he also allegedly refused to open the cell door for the same reason. (Dkt. No. 81-10). Eventually, Nurse Davila, Dr. Schafer, and Saxon checked on Lason through an open flap in his cell and saw him lying naked and weak on the floor. (Dkt. No. 81-4). On February 11, 2022, Dr. Schafer then directed Lieutenant McCollough to have Lason moved from his cell upstairs, Cell # 52, to Cell #10 on the lower level of the SHU and placed on "suicide watch." (*Id.*). That night and through the next morning, Officer Coleman was directed to conduct suicide watch. (Dkt. No. 81-15). The morning of February 12, 2022, Sergeant Callahan took over suicide watch. (Dkt. No. 81-25). There was a 50-minute gap between the 6:00 a.m. log entry, when Officer Coleman left to serve breakfast, and the 6:50 a.m. log entry, when

2

Sergeant Callahan documented his first check on Lason. (Dkt. No. 80-22). Around 7:15 a.m., Officer Coleman asked Sergeant Callahan to check on Lason after he did not respond regarding breakfast. (Dkt. No. 81-15). Sergeant Callahan found Lason unresponsive, declared a medical emergency and began compressions until a nurse arrived and relieved him. (*Id.*). Lason's death was estimated between 6:00 a.m. and 7:30 a.m., and the cause of death was determined to be complications from dehydration. (Dkt. No. 81-18).

Interim Director Kitchen testified that Richland County allocated funds to fill many more positions than it was actually able to fill, and that he attempted unsuccessfully to address the chronic understaffing at ASGDC. (Dkt. No. 81-41). He also testified that ASGDC had a single plumber and an inmate helper who were unable to keep up with the constant repairs. (Dkt. No. 86-10). Director Harvey noted that the SHU was not conducive to housing detainees with mental health needs, including those on suicide watch. (Dkt. No. 80-2).

Lakeshia Butler, as Personal Representative of the Estate of Lason, filed a Complaint on August 3, 2022, alleging (a) a wrongful death action and survival action based on conditions of confinement in violation of the Fourteenth Amendment pursuant to § 1983 against Interim Director Kitchen, Sergeant Callahan, Officer Coleman, Captain Bufford, Lieutenant McCollough, and Officer Milhouse in their individual capacities; (b) a wrongful death action and survival action based on conditions of confinement in violation of the Fourteenth Amendment pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978) against Richland County and Interim Director Kitchen in his official capacity; (c) a wrongful death action and survival action for deliberate indifference to serious medical needs in violation of the Fourteenth Amendment pursuant to § 1983 against Interim Director Kitchen, Sergeant Callahan, Officer Coleman, Captain Bufford, Lieutenant McCollough, and Officer Milhouse in their individual

capacities; and (d) a wrongful death action and survival action for deliberate indifference to Lason's medical needs in violation of the Fourteenth Amendment pursuant to *Monell* against Richland County and Interim Director Kitchen in his official capacity. (Dkt. No. 1).

On July 22, 2024, Plaintiff filed a Motion for Partial Summary Judgment on her claims for deliberate indifference to Lason's serious medical needs. (Dkt. No. 80). Defendants filed a Response on August 21, 2024 (Dkt. No. 85), and Plaintiff filed a Reply on September 4, 2024 (Dkt. No. 91). Also on July 22, 2024, Defendants filed a Motion for Summary Judgment. (Dkt. No. 81). Plaintiff filed a Response on August 21, 2024 (Dkt. No. 86), and Defendants filed a Reply on September 4, 2024 (Dkt. No. 90). These matters are now ripe for review.

## II.    Legal Standard

### A.   Review of R&R

The Magistrate Judge makes only a recommendation to this Court that has no presumptive weight, and the responsibility to make a final determination remains with the Court. *Mathews v. Weber*, 423 U.S. 261, 270-71 (1976). The Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Where the plaintiff objects to the R&R, the Court "makes a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.* Where the plaintiff has not objected to the R&R, the Court reviews the R&R only to "satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Fed. R. Civ. P. 72 advisory committee's note; *see also Camby v. Davis*, 718 F.2d 198, 199 (4th Cir. 1983) ("In the absence of objection ... we do not believe that it requires any explanation.").

### B.   Motion for Summary Judgment

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact" and is therefore entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In other words, summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). "In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996). The party seeking summary judgment has the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has made this threshold demonstration, the non-moving party must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, "[c]onclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence'" in support of the non-moving party's case. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (quoting *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999)).

### III.  Discussion

#### A.  Deliberate Indifference to Serious Medical Needs

Plaintiff brought claims for deliberate indifference to Lason's serious medical needs against (1) Sergeant Callahan, Officer Coleman, Captain Bufford, Lieutenant McCollough, Officer Milhouse, and Interim Director Kitchen in their individual capacities and (2) Richland County and Interim Director Kitchen in his official capacity pursuant to *Monell*. (Dkt. No. 1). Both Plaintiff and Defendants moved for summary judgment on these claims. (Dkt. Nos. 80; 81).

Defendants argue that they are entitled to qualified immunity, which immunizes them from civil damage suits as long as the conduct in question does not "violate clearly established rights of

which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). However, qualified immunity does not protect the plainly incompetent. *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998). Qualified immunity also does not protect government officials who act recklessly or in violation of a clearly established constitutional right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *United States ex rel. Citynet, LLC v. Gianato*, 962 F.3d 154, 159 (4th Cir. 2020), citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

For Plaintiff to state a claim under § 1983 for deliberate indifference to serious medical needs, Plaintiff must show that Lason had a serious medical need and that officials knowingly disregarded that need and the substantial risk it posed. *See King v. Rubenstein*, 825 F.3d 206, 218–20 (4th Cir. 2016). The law at the time of the conduct in question requires an objective showing of a serious medical need, and a showing that the official in question "subjectively recognized a substantial risk of harm" and "subjectively recognized that his actions were inappropriate in light of that risk." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004).

### i.  Individual Capacity Claims

The Court finds that the Magistrate Judge properly addressed the factual and legal issues regarding Plaintiff's claim of deliberate indifference to serious medical needs and correctly concluded that Plaintiff's Motion for Partial Summary Judgment should be denied, and Defendants' Motion for Summary Judgment should be denied in part and granted in part. Defendants objected to the Magistrate Judge's finding as to Defendants McCollough, Milhouse, Callahan, and Coleman. (Dkt. No. 99). As further explained below, the Court adopts the Magistrate Judge's R & R regarding the deliberate indifference to serious medical needs claims. (Dkt. No. 95 at 25-43).

As an initial matter, the Court agrees with the Magistrate Judge's finding that when viewing the evidence in the light most favorable to Defendants, a reasonable jury could conclude that Lason had a serious medical need. (*Id*. at 28-30).

### a. Captain Bufford

The Magistrate Judge correctly concluded that Plaintiff's Motion for Partial Summary Judgment regarding her deliberate indifference to serious medical needs claim should be denied as to Captain Bufford, and Defendants' Motion for Summary Judgment should be granted as to Captain Buford. There is insufficient evidence that Captain Bufford subjectively recognized that his actions were inappropriate in light of the risk. To the contrary, Captain Bufford took immediate steps to request medical assistance for Lason when he saw that Lason appeared to be experiencing a mental health episode. Therefore, the Court grants Defendant's Motion for Summary Judgment as to Captain Bufford and dismisses Plaintiff's claim of deliberate indifference to serious medical needs against him.

### b. Lieutenant McCollough

The Magistrate Judge correctly concluded that Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment should be denied regarding Plaintiff's deliberate indifference to serious medical needs claim as to Lieutenant McCollough. Defendant objected, arguing that Plaintiff has not established that Lieutenant McCollough actually knew of the risk to Lason, and that he knew his actions were inappropriate. (Dkt. No. 99).

The Court agrees with the Magistrate Judge's finding that a reasonable jury could conclude that Lieutenant McCollough subjectively recognized a substantial risk of harm to Lason. While there is evidence that medical staff was responsible for monitoring Lason's food and liquid intake, there is also evidence that Lieutenant McCollough did not take Lason to medical or check on him

7

in a timely manner despite being directed to do so by his superior. Defendant argues that Lieutenant McCollough was entitled to rely on the judgments of the medical staff (Dkt. No. 99). The record shows, however, that Lieutenant McCollough was specifically directed to put Lason on suicide watch "so the officers can monitor his intake," and he allegedly failed to tell the officers conducting suicide watch that Lason's food and liquid intake needed to be monitored. (Dkt. No. 80-19).

It is a factual question whether Lieutenant McCollough's response to the condition of Lason's cell was so inadequate as to justify an inference that he actually recognized that his response to the risk was inappropriate. Therefore, the Court denies Plaintiff's Motion for Partial Summary Judgment and Defendant's Motion for Summary Judgment as to Lieutenant McCollough on this claim.

### c. Officer Milhouse

The Magistrate Judge correctly concluded that Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment on the deliberate indifference to serious medical needs claim should be denied as to Officer Milhouse. Defendant objected, arguing that Plaintiff has not established that Officer Milhouse knew of the risk to Lason, and knew his actions were inappropriate. (Dkt. No. 99).

There is a material factual dispute concerning whether Officer Milhouse subjectively recognized a substantial risk of harm to Lason. Officer Milhouse observed Lason lying nude in his cell, weak, struggling to hold up his head and talking in a very soft tone, and prevented the nurse from checking Lason's vitals because there was not another officer present. (Dkt. No. 81-15). Officer Milhouse contends he did not observe "in any kind of distress" (Dkt. No. 81-15) and was following SHU's policy requiring the presence of two officers to open a cell. Viewing all facts in the light most favorable to the nonmoving party, the Court finds that Plaintiff has

8

established a genuine dispute of material fact as to Officer Milhouse's subjective knowledge. Therefore, the Court denies Plaintiff's Motion for Partial Summary Judgment and Defendant's Motion for Summary Judgment as to Officer Milhouse on this claim.

### d.  Officer Coleman

The Magistrate Judge correctly concluded that Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment regarding Plaintiff's deliberate indifference to serious medical needs claim should be denied as to Officer Coleman. Defendants objected to the R&R's finding, arguing there is no evidence that Officer Coleman subjectively recognized a substantial risk of harm to Lason. (Dkt. No. 99).

The record contains facts which create a material dispute concerning whether Officer Coleman subjectively recognized a substantial risk of harm to Lason. Officer Coleman testified that he never saw Lason act like he was in any kind of distress, and he did not personally observe anything physically wrong with Lason. However, Officer Coleman did not check on Lason every five minutes in accordance with ASGDC policy, he allegedly fabricated the breakfast log prior to Lason being served breakfast, and he left his suicide watch post to serve breakfast. Defendant also argues that Officer Coleman was entitled to defer to the judgments of the medical professionals (Dkt. No. 99), but the record is unclear concerning whether there was any medical diagnosis or treatment he could reasonably rely upon.

Whether Officer Coleman recognized that his response to the risk was inappropriate under the circumstances is a jury question. Therefore, the Court denies Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment as to Officer Coleman on this claim.

### e.  Sergeant Callahan

The Magistrate Judge correctly concluded that Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment regarding the deliberate indifference to serious medical needs claim should be denied as to Sergeant Callahan. Defendants objected to the R&R's finding, arguing that there is no evidence that Sergeant Callahan subjectively recognized a substantial risk of harm to Lason. (Dkt. No. 99).

The record shows that Sergeant Callahan observed Lason lying naked and unresponsive in his cell, but also noted that Lason did not appear to be in distress. (Dkt. No. 81-17). The Magistrate Judge correctly noted that there is evidence that Sergeant Callahan may have denied Nurse Davila access to Lason based on the SHU's policy requiring the presence of two officers to open a cell door, and it is unclear whether the gap in the suicide watch log was caused by Officer Coleman or Sergeant Callahan. Defendant also argues that Sergeant Callahan was entitled to defer to the judgments of the medical professionals, but he allegedly prevented the medical staff from examining and treating Lason. The Court denies Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment as to Sergeant Callahan on this claim.

### f.  Interim Director Kitchen

The Magistrate Judge correctly concluded that Plaintiff's Motion for Partial Summary Judgment should be denied as to Interim Director Kitchen and Defendants' Motion for Summary Judgment on the deliberate indifference claim should be granted as to Interim Director Kitchen. To establish personal liability under § 1983, a plaintiff must "affirmatively show[ ] that the official charged acted personally in the deprivation of the plaintiff's rights." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (internal quotation marks omitted). Plaintiff has failed to point to

sufficient evidence that Interim Director Kitchen assigned Lason to the SHU or otherwise inappropriately responded to Lason's health risk under the circumstances.

In sum, the Court agrees with the Magistrate Judge that there are genuine issues of material fact regarding Plaintiff's deliberate indifference to serious medical needs claims against Lieutenant McCollough, Officer Milhouse, Officer Coleman, and Sergeant Callahan. Therefore, the Court denies Plaintiff and Defendants' Motions for Summary Judgment on those claims. Additionally, the Court agrees with the Magistrate Judge that no reasonable jury could conclude that Captain Bufford or Interim Director Kitchen were deliberately indifferent towards the serious medical needs of Lason. Because neither Defendant violated clearly established rights, the Court finds that Captain Bufford and Interim Director Kitchen are entitled to qualified immunity and grants Defendants' Motion for Summary Judgment as to them on this claim.

### ii.  *Monell* Claims

Plaintiff argues that Richland County and Interim Director Kitchen in his official capacity are liable pursuant to *Monell* for violating Lason's Fourteenth Amendment rights through their deliberate indifference to Lason's serious medical needs. (Dkt. No. 80 at 23-28). Specifically, Plaintiff argues that Richland County and Interim Director Kitchen are liable for understaffing ASGDC. *Id*.

"[A] municipality is liable under § 1983 if it follows a custom, policy, or practice by which local officials violate a plaintiff's constitutional rights." *Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014) (emphasis in original) (citations omitted). An official policy or custom that gives rise to liability can arise in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure

> to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 533 (4th Cir. 2024).

### a. Interim Director Kitchen

The Magistrate Judge correctly concluded that Plaintiff's *Monell* claim against Interim Director Kitchen should be dismissed because it is duplicative of her *Monell* claim against Richland County. (Dkt. No. 95 at 11-12). A claim against a public official in his official capacity is "essentially a claim against" the governmental entity that the official represents. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Therefore, the Court dismisses Plaintiff's *Monell* claim against *Interim Director Kitchen* as duplicative.

### b. Richland County

The Magistrate Judge correctly concluded that Richland County's continued understaffing of ASGDC could constitute a custom or usage with the force of law such that it establishes liability under *Monell*. The R&R's summary of the record shows that the ASGDC was consistently understaffed. Interim Director Kitchen made multiple attempts to address the staffing deficiencies, including increasing detention officer salaries, requiring overtime, and attending job fairs to recruit new officers. The Court agrees with the Magistrate Judge's conclusion that both Plaintiff and Defendants' Motions for Summary Judgment should be denied. Determining whether Interim Director Kitchen's conduct constitutes deliberate indifference requires weighing the evidence in the record. Because this is a jury question, Plaintiff's *Monell* claim against Richland County for deliberate indifference remains. However, Plaintiff's request for punitive damages on this claim are denied because Richland County is immune from punitive damages under § 1983 actions. *See*

*City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) ("[W]e hold that a municipality is immune from punitive damages under 42 U.S.C. § 1983.").

### B.  Conditions of Confinement

Plaintiff asserts claims for deliberate indifference to Lason's conditions of confinement against (1) Sergeant Callahan, Officer Coleman, Captain Bufford, Lieutenant McCollough, Officer Milhouse, and Interim Director Kitchen in their individual capacities and (2) Richland County and Interim Director Kitchen in his official capacity pursuant to *Monell*. (Dkt. No. 1). Defendants moved for summary judgment on these claims arguing the individual Defendants are entitled to qualified immunity. (Dkt No. 81). The Magistrate Judge recommended granting Defendant's motion (Dkt. No. 95), and Plaintiff objected (Dkt. No. 100).

For Plaintiff to state a claim that his conditions of confinement violated the Constitution at the time of his confinement, he generally must meet two requirements: (1) objectively, the deprivation suffered "is not one that today's society chooses to tolerate," *Helling v. McKinney*, 509 U.S. 25, 36 (1993), and (2) the prison official had knowledge of a substantial risk of harm to a prisoner and that the official disregarded that risk. *Helling v. McKinney*, 509 U.S. 25, 36 (1993). Both elements require "a showing of actual knowledge;" it is not enough to show they should have recognized a substantial risk of harm. *Parrish*, 372 F.3d at 302-03. However, the Fourth Circuit has noted that actual knowledge "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id*. at 303 (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). The Fourth Circuit explained,

> a factfinder may conclude that [an officer] knew of a substantial risk from the very fact that the risk was obvious. But, it is not enough that a reasonable officer would have found the risk to be obvious. Rather, the risk of injury must be so obvious that the fact-finder

could conclude that the [officer] did know of it because he could not have failed to know of it.

*Parrish*, 372 F.3d at 303 (citations and quotations omitted). Actual knowledge may also be evidenced by recorded reports to or discussions by a municipal governing body. *Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987).

### i. Individual Capacity Claims

The Court finds that the Magistrate Judge correctly concluded that a reasonable jury could find that the deprivation Lason suffered was sufficiently serious for this claim. The Court now turns to the second prong of the deliberate indifference test: whether the individual had knowledge of a substantial risk of harm to Lason and disregarded that risk.

The Magistrate Judge found that Plaintiff has failed to show that that the individual Defendants had actual knowledge of a substantial risk of harm to Lason based on his conditions of confinement and disregarded that risk. Plaintiff objects to this finding in the R&R, arguing that the Defendants had sufficient knowledge of the conditions of Lason's confinement. (Dkt. No. 100). As discussed below, the Court finds that there are material factual disputes concerning whether Lieutenant McCollough, Officer Coleman, Sergeant Callahan, and Interim Director Kitchen had knowledge of the substantial risk of harm to Lason and disregarded that risk. The Court concurs in the Magistrate Judge's finding that the record contains insufficient evidence to show that Captain Bufford and Officer Milhouse had knowledge of substantial risk to Lason and disregarded that risk.

Plaintiff was allegedly bitten and tormented by rats while in custody, and Deputy Coroner Gurganious testified that Lason's downstairs cell, Cell #10, was so infested with flies and gnats that flies flew out of Lason's mouth when they removed the sheet from over his body. (Dkt. No.

14

86-46). She also testified that she commented on this to some officers, who told her that there was little point in cleaning up if the detainees were just going to throw feces and food everywhere. (*Id*.). She noted that Lason's upstairs cell, Cell #52, had trash, urine, and feces everywhere, that there was a gut-wrenching smell, and that it was infested with numerous kinds of bugs and rodent feces. (*Id*.). The Magistrate Judge also recognized evidence of garbage, filth, human excrement, and insect infestation in Lason's cells in the SHU, as well as constant and recurring plumbing issues. (Dkt. No. 95 at 52-53).

There are over 400 toilets at ASGDC, and the facility employed at this time a single plumber. The plumber, Richard Pampel, testified that he heard daily complaints from detainees about plumbing malfunctions and that it was widely known the plumbing was outdated and the fixtures needed replacing. (Dkt. No. 86-31). A risk management consultant hired by Richland County noted that the inoperable toilets were a constant problem, violated minimum standards, and that the county faced the likelihood that a detainee would win a condition of confinement lawsuit. (Dkt. No. 86-30).

Plaintiff notes that "according to policies and procedures produced by the Defendants in this case, each shift requires all staff to ensure the facility is clean and in good repair." (Dkt. No. 100 at 12). SHU officers are required to inspect all rooms at least once per shift, but the state of Lason's cell allegedly never improved, and no reports were filed outlining the condition of the cell. (*Id*.). Plaintiff alleged that during the detention of Lason from January 30th through the date of his death on February 12th, the log shows no notations of cleaning Lason's upstairs cell, Cell#52, despite Defendants Coleman and Callahan being on shift in the SHU, with supervision indicated by Defendants McCollough and Callahan. (Dkt. No. 86-4). Captain Bufford sent an email order to Lieutenant McCollough to clean up the cell on February 10, but photos of the cell from

15

February 12 shows it had not been cleaned. (Dkt. No. 81-6). Captain Bufford and Officer Coleman's deposition shows they were aware of rodents at ASGDC. (Dkt. Nos. 86-6;86-20). Pampel even noted that it was a running "joke" at the facility that they must be putting "lemon sugar" into the traps for the "rats." (Dkt. No. 86-31). Darius Whitener, an ASGDC detainee who was in the cell next to Lason in the SHU, submitted a sworn affidavit regarding the officers' indifference to feeding Lason, and Whitener's direct knowledge of Lason being tormented by the rodents in his cell. (Dkt. No. 86-43).

Whitener's affidavit also states that that the entire time Lason was at ASGDC, Whitener "never once saw anyone let [Lason] out of his cell to shower, have recreation, make a phone call, or go to medical." (Dkt. No. 86-43). The unit log demonstrates that Lason was not offered recreation at any time while he was in the SHU, even though the policy was to allow for one-hour of exercise per day outside of the cell. (Dkt. No. 80 at 20).

In less than two weeks, Lason lost 42 pounds, equal to 16% of his body weight. (Dkt. No. 80 at 22). Lason spent the last 12 days of his life locked away in a jail cell allegedly without a working toilet, with an infestation of bugs and rats, and with bodily excrement everywhere.

### a.  Captain Bufford

The Magistrate Judge correctly concluded that Defendants' Motion for Summary Judgment should be granted as to Captain Bufford. Plaintiff objected, arguing that there is enough evidence to create a dispute of fact as to Captain Bufford's subjective knowledge. (Dkt. No. 100). The Court disagrees with Plaintiff.

There is no evidence that Captain Bufford subjectively recognized that his actions were inappropriate in light of the risk. In fact, he emailed Lieutenant McCollough to clean the cell once he saw it. (Dkt. No. 81-5). The logs referenced by Plaintiff in her Objections do not show Bufford

as being on shift in SHU or indicate his supervision during the days that Lason was detained at ASGDC. (Dkt. No. 86-4). Plaintiff has not pointed to any evidence that Captain Bufford saw Lason's Cell #52 prior to February 11th. There is also no evidence that Captain Bufford was personally involved in Lason not being offered recreation. Therefore, the Court grants Defendant's Motion for Summary Judgment as to Captain Bufford and dismisses Plaintiff's claims against him.

### b. Lieutenant McCollough

The Magistrate Judge recommended that Defendants' Motion for Summary Judgment be granted as to Officer McCollough. Plaintiff objected, arguing that there is enough evidence to create a dispute of fact as to Lieutenant McCollough's subjective knowledge. (Dkt. No. 100). The Court agrees with Plaintiff.

Lieutenant McCollough testified that Saxon told him that Lason "was weak, she didn't believe that he was eating, and that she wanted [Lieutenant McCollough] to put him on watch so the officers can monitor his intake." (Dkt. No. 81-12). There is no evidence that Lieutenant McCollough conveyed this information regarding monitoring food and liquid intake to unit officers. The logs allegedly show that McCollough was on shift in the SHU in a supervisory capacity for several days prior to February 11 during Lason's detainment at ASGDC. (Dkt. No. 86-4). SHU officers are required to inspect all rooms at least once per shift, but the state of Lason's cell allegedly never improved, and no reports were filed outlining the condition of the cell. Further, on February 10, 2022, Captain Bufford emailed Lieutenant McCollough, asking to have Lason's cell cleaned. (Dkt. No. 86-17). However, the log does not show any notations of staff cleaning Cell #52 until February 11, after Lason was moved. (Dkt. No. 86-4). The journal does show that inmate workers entered Cell #52 to clean it, but the photograph of the cell on February 12, 2022, shows it had not been cleaned, despite the email order from Captain Bufford. (Dkt. No. 86-4). Also, in June

2022, Lieutenant McCollough allegedly responded to an email from the VA volunteer, noting that water in a cell was turned off as a result of a similar issue with the toilet raised the previous year. (Dkt. No. 86 at 21).

A reasonable jury could conclude that Lieutenant McCollough knew that Lason's cell needed to be cleaned and fixed, that he needed to have his liquid intake monitored, and that Lieutenant McCollough disregarded those risks. Therefore, the Court declines to adopt the recommendation of the Magistrate Judge regarding the deliberate indifference to conditions of confinement claim and denies Defendant's Motion for Summary Judgment as to Lieutenant McCollough.

### c.  Officer Milhouse

The Magistrate Judge correctly concluded that Defendants' Motion for Summary Judgment should be granted as to Officer Milhouse. Plaintiff objected, arguing that there is enough evidence to create a dispute of fact as to Officer Milhouse's subjective knowledge. (Dkt. No. 100).

Plaintiff has not provided sufficient evidence showing Officer Milhouse interacted with Lason until February 11th or knew of the condition of his cell. Officer Milhouse was a Transportation Officer involved in the transportation of detainees, he only worked in the SHU when asked to fill in, and he did not know what was happening regularly in the SHU. (Dkt. No. 81-9). Further, Officer Milhouse testified that he was not aware of any cells at ASGDC that did not have running water. (*Id*.). Because Plaintiff has failed to establish evidence that Officer Milhouse's individual actions regarding Lason's conditions of confinement showed deliberate indifference, the Court grants Defendants' Motion for Summary Judgment as to Officer Milhouse.

### d.  Officer Coleman

18

The Magistrate Judge recommended that Defendants' Motion for Summary Judgment be granted as to Officer Milhouse. Plaintiff objected, arguing that there is enough evidence to create a dispute of fact as to Officer Coleman's subjective knowledge. (Dkt. No. 100).

Officer Coleman was assigned to the SHU to conduct suicide watch on the evening of February 11, 2022. (Dkt. No. 81-15). Around midnight, a nurse told Officer Coleman that Lason's food and liquid intake needed to be monitored. (Dkt. No. 80-17). Officer Coleman testified that he checked on Lason "regularly" and saw him resting in different positions throughout the night. (Dkt. No. 81-15). Therefore, a jury could conclude that Office Coleman saw the conditions of the cell. Further, Officer Coleman testified that he can still see in the suicide watch cells while he is serving chow even though he is not physically standing at the cells' flaps. (Dkt. No. 80-17). In 2021, Officer Coleman was issued a formal reprimand for allowing a detainee who complained of having no running water in his cell to take a drink of water from his own personal cup (Dkt. No. 86-36). A reasonable jury could conclude that Officer Coleman knew about a risk of no running water, he knew that Lason needed his liquid intake to be monitored, he saw the condition of Lason's cell, he knew he was supposed to watch over Lason that night, but he consciously disregarded those risks. Viewing all facts in the light most favorable to the nonmoving party, Plaintiff has provided sufficient evidence to establish a genuine dispute as to Officer Coleman's subjective knowledge. Therefore, the Court declines to adopt the recommendation of the Magistrate Judge and denies Defendant's Motion for Summary Judgment as to Officer Coleman on this claim.

### e.  Sergeant Callahan

19

The Magistrate Judge recommended that Defendants' Motion for Summary Judgment be granted as to Sergeant Callahan. Plaintiff objected, arguing that there is enough evidence to create a dispute of fact as to Sergeant Callahan's subjective knowledge. (Dkt. No. 100).

Sergeant Callahan testified that he had no personal involvement with Lason until he was asked to help move Lason from Cell #52 to Cell #10. (Dkt. No. 81-25). Sergeant Callahan also testified that there was a constant problem with inmates in the SHU not having running water. (Dkt. No. 86-7). In fact, Darius Whitener, an inmate housed in Cell #51, testified that the water to Lason's cell and other nearby cells were turned off for about two weeks, and that he heard Lason "crying out at night for someone to get the rats to leave him alone." (Dkt. No. 86-43). Sergeant Callahan was allegedly on shift in the SHU for several days prior to February 11 during Lason's detainment at ASGDC. (Dkt. No. 86-4). Knowing that running water to Lason's cell was an issue, Sergeant Callahan conducted suicide watch over Lason, who died of dehydration. A reasonable jury could conclude that Sergeant Callahan's response to the condition of Lason's cell was so inadequate as to justify an inference that he actually recognized that his response to the risk was inappropriate. The Court declines to adopt the recommendation of the Magistrate Judge and denies Defendants' Motion for Summary Judgment as to Sergeant Callahan on this claim.

### f. Interim Director Kitchen

The Magistrate Judge recommended that Defendants' Motion for Summary Judgment be granted as to Interim Director Kitchen. Plaintiff objected, arguing that there is enough evidence to create a dispute of fact as to Interim Director Kitchen's subjective knowledge, or supervisory liability. (Dkt. No. 100).

20

Defendant Kitchen argues that he was not personally involved in failing to provide constitutionally sufficient conditions of confinement. However, Plaintiff has established a genuine dispute of material fact as to whether Interim Director Kitchen is subject to supervisory liability.

The Fourth Circuit has laid out three elements necessary to establish supervisory liability under § 1983:

> "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff."

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations and internal quotations omitted). Establishing supervisory liability "requires evidence that the conduct is widespread, or at least has been used on several different occasions" to demonstrate a "supervisor's 'continued inaction in the face of documented widespread abuses.'" *Id.* at 799.

Director Harvey noted that SHU was not conducive to housing detainees with mental health needs, including those on suicide watch. (Dkt. No. 80-2). Director Harvey testified that Lason's recreation time should be documented in the SHU journal. (*Id.*). However, there is no indication in the SHU journal that Lason was ever offered recreation time during his period of detainment. (*See* Dkt. No. 80-4). Whitener testified that in the entire time Lason was at ASGDC, Whitener "never once saw anyone let [Lason] out of his cell to shower, have recreation, make a phone call, or go to medical." (Dkt. No. 86-43). The courts have recognized the substantial risk of serious harm when confining an inmate to his cell for prolonged periods. *see, e.g., Porter*, 923 F.3d at 355-58 (4th Cir. 2019) (finding that the challenged conditions of confinement, in which a plaintiff spent

21

23 to 24 hours per day alone in a small cell with no access to religious, educational, or social programming posed a substantial risk of serious psychological and emotional harm under the Eighth Amendment)

Kitchen testified that he knew of the constant plumbing complaints and the periodic lack of running water in the cells. (Dkt. Nos. 86-11). The record is unclear whether there was running water in Lason's cells. In a report from a risk management consultant hired by Richland County, it notes that the "constant" problem of inoperable toilets was a violation of minimum standards and should have resulted in changes to rating capacity based on the number of working toilets in a dorm. (Dkt. No. 86-30). The report further forecasted the "likelihood of [a detainee] winning a 'conditions of confinement' lawsuit" against Defendant Richland County. (*Id*.). Kitchen acknowledged that there was a single plumber and an inmate helper to handle over 400 toilets and that they were unable to keep up. (Dkt. No. 86-11). The plumber testified that when water went out in a cell, it would sometimes take days to get the parts in to make a repair. (Dkt. No. 86-31).

The maintenance reporting system was so disorganized and confusing that the officers generally operated more on a "word-of-mouth" system in reporting and closing out maintenance issues. (Dkt. No. 86-31). Kitchen noted that there were numerous discussions about the same units having pervasive plumbing issues, but Kitchen did not look at the work order system to analyze it. (Dkt. No. 86-11). The work orders presented by Richland County show that despite these "constant and recurring" plumbing maintenance issues, there were zero work orders placed into the system between October of 2021 and March of 2022. (Dkt. No. 86-32). In July of 2021, the public defender's office reported plumbing issues in the SHU that involved a broken toilet flooding the cell, and all drinking water being turned off. (Dkt. No. 86-35). The following month, Defendant Coleman was issued a formal reprimand for allowing a detainee who complained of having no

running water in his cell to take a drink of water from his own personal cup. (Dkt. No. 86-36). In January 2022, a volunteer from the VA called to report that the conditions at ASGDC included lack of hygiene, and plumbing and water issues. (Dkt. No. 86-38). Kitchen replied that he "had been hearing" many of the same complaints and noted that they needed to get on top of the problem. (Dkt. No. 86-38). Lason died the next month from dehydration. (Dkt. No. 81-18).

A reasonable jury could conclude that Interim Director Kitchen knew his subordinates were not ensuring each cell was clean, rat-free, and had running water, that Interim Director Kitchen's response was inadequate, and that his inaction proximately caused Lason's suffering.

Plaintiff has alleged enough facts to create a genuine dispute of material fact as to whether Interim Director Kitchen is subject to supervisory liability. *See Farmer v. Brennan*, 511 U.S. 825, 826 (1994) ("It does not matter whether the risk came from a particular source or whether a prisoner faced the risk for reasons personal to him or because all prisoners in his situation faced the risk."). Therefore, the Court declines to accept the recommendation of the Magistrate Judge and denies Defendant's Motion for Summary Judgment as to Interim Director Kitchen on the deliberate indifference to conditions of confinement claim.

### ii. *Monell*

Plaintiff brought deliberate indifference claims based on Lason's conditions of confinement against Richland County and Interim Director Kitchen in his official capacity pursuant to *Monell*. Both parties moved for summary judgment on these claims. (Dkt. Noe. 81-1; 80). Because the Magistrate Judge recommended dismissing Plaintiff's claims for deliberate indifference to the conditions of confinement as to all the individual defendants, he found no underlying constitutional violation that can provide the foundation for *Monell* liability against Interim Director Kitchen and Richland on this claim. Plaintiff objected to the R&R regarding these

claims. (Dkt. No. 100). The Court finds that Plaintiff has established sufficient evidence to create a dispute of fact regarding Richland County's *Monell* liability.

As stated above, "a municipality is liable under § 1983 if it follows a custom, policy, or practice by which local officials violate a plaintiff's constitutional rights." *Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014) (emphasis in original) (citations omitted). An official policy or custom that gives rise to liability can arise in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 533 (4th Cir. 2024).

### a. Interim Director Kitchen

The Magistrate Judge correctly concluded that Plaintiff's *Monell* claim against Interim Director Kitchen should be dismissed because it is duplicative of her *Monell* claim against Richland County. Therefore, the Court dismisses Plaintiff's *Monell* claim against Interim Director Kitchen as duplicative.

### b. Richland County

Because the Magistrate Judge found no underlying constitutional violation regarding the alleged deliberate indifference to Lason's conditions of confinement, he found no *Monell* liability. However, because this Court finds that Plaintiff sufficiently established disputed facts regarding the liability of the individual defendants, this Court will determine if a jury could find that Richland County has liability under *Monell*. Plaintiff objected to the R&R's finding here, arguing that

24

Richland County is liable because there was a custom and practice of not meeting the minimum jail cell standards that proximately caused Lason's injury. (Dkt. No. 100).

As stated above, Lason's recreation time should have been documented, but there is no indication in the SHU journal Lason was ever offered recreation time during his period of detainment. (*See* Dkt. No. 80-4). Further, Lason's cell neighbor testified that in the entire time Lason was at ASGDC, Whitener "never once saw anyone let [Lason] out of his cell to shower, have recreation, make a phone call, or go to medical." (Dkt. No. 86-43). The courts have recognized the substantial risk of serious harm when confining an inmate to his cell for prolonged periods. *See, Porter*, 923 F.3d at 355-58 (4th Cir. 2019) (finding that the challenged conditions of confinement, in which a plaintiff spent 23 to 24 hours per day alone in a small cell with no access to religious, educational, or social programming posed a substantial risk of serious psychological and emotional harm under the Eighth Amendment). While Defendant argues that none of the individual Defendants specifically denied Lason recreation, the fact remains that none of the officers overseeing his safety provided him with his required recreation time.

Staffing was another issue at ASGDC. In his deposition, Pampel described how staffing issues at the jail impacted the provision of maintenance services, and that the maintenance director expressed frustration with the understaffing of maintenance, lack of equipment update, and the need for more maintenance funding. (Dkt. No. 86-31). Despite ASGDC policy requiring two officers on duty in the SHU during each shift (not including the suicide watch officer), at least twice officers refused to open the door to Lason's cell for security reasons because they lacked another officer present. (Dkt. Nos. 81-8; 81-10). Lieutenant McCollough testified that he did not take Lason to medical on February 11, 2022, despite Captain Bufford's directive to do so because there "was so much going on to where you're not able to do everything by yourself." (Dkt No. 80-

19). Officer Coleman testified that as a matter of practice, suicide watch officers help serve chow, even though they are required to check on the inmate every 5 minutes. (Dkt. No. 80-17). Officer Coleman noted that ASGDC does not have the "bodies" for him to just conduct suicide watch and not assist with serving meals and explained that he has to make his "best attempt" to "accomplish all the things [he has] to do with the staffing that [they] have." (Dkt. No. 80-17). In Interim Director Kitchen's affidavit, he stated that Richland County allocated funds to fill many more positions than it was actually able to fill. (Dkt. No. 81-41). In an attempt to fill the staffing needs, Interim Director Kitchen attended job fairs to recruit new officers and implemented "required overtime" to fill the open positions. (*Id*.). The Magistrate Judge already correctly found that Richland County's continued understaffing of ASGDC, despite its awareness of the staffing issues, could constitute a custom or usage with the force of law such that it establishes liability under *Monell* for Plaintiff's claim of deliberate indifference to a serious medical need. The Court finds this true for this claim as well.

The plumbing in the SHU was also a large problem. The ASGDC plumber described situations where Defendant Richland County delayed funds for weeks to months to get the parts he needed. (Dkt. No. 86-31). He also noted that when water went out in a cell, it would sometimes take days to get the parts in to make a repair. (*Id*.). The risk management report that Richland County funded noted that the inoperable toilets were a constant problem, violated minimum standards, and that the county faced the likelihood that a detainee would win a condition of confinement lawsuit. (Dkt. No. 86-30). Work order records produced by Richland County show that despite these "constant and recurring" plumbing maintenance issues, there were zero work orders placed into the system between October of 2021 and March of 2022. (Dkt. No. 86-32). And as shown above, the system was allegedly mismanaged and generally operated on a "word-of-

mouth" system. (Dkt. No. 86-31). Further, Interim Director Kitchen noted that he did not monitor the maintenance work order system and was not aware of the more than five month lapse of documentation in the system during the time Lason died of dehydration at the facility. (Dkt. No. 86-11). The public defender's office emailed Interim Director Kitchen reporting plumbing issues, including loss of drinking water. (Dkt. No. 86-35). Plaintiff has created a genuine dispute of material fact as to whether Richland County knew of the constant plumbing problems in the SHU.

Lastly, ASGDC experienced a rodent problem that went unfixed. Whitener claimed Lason was screaming at night, tormented by rats. (Dkt. No. 86-43). There were allegedly rat bites on Lason's body. (Dkt. No. 86-25). As stated above, there was a running joke at the facility that they must be putting "lemon sugar" into the traps for the "rats." (Dkt. No. 86-31). Officer Bufford and Captain Bufford were aware of reports of rodents. (Dkt. Nos. 86-6; 86-20). Director Harvey noted that ASGDC had a contract for monthly pest control services in 2021 and 2022, which treated the facility on a routine basis and visited the facility in response to specific complaints. (Dkt. No. 81-7). From this information, a jury could conclude that Richland County knew about the rats at ASGDC, and that because Officers were required to clean the cells frequently, there was policy that Officers would not be punished for ignoring the rats in inmates' cells.

### C. Qualified Immunity

To the extent applicable, Defendants assert that they are entitled to qualified immunity in their individual capacities. When determining whether a government official is entitled to summary judgment based on qualified immunity, courts engage in a two-pronged inquiry. *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015). The first prong concerns whether the facts, viewed in a light most favorable to the non-moving party, demonstrate that the officer's conduct violated a federal right. *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second prong concerns

whether the "right was clearly established at the time the violation occurred such that a reasonable person would have known that his conduct was unconstitutional." *Smith*, 781 F.3d at 100. A right is "clearly established" if the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. at 640 (1987).

If a court decides in the negative the first prong it considers, the court need not consider the other prong of the qualified immunity analysis. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As stated above, the Court found that Plaintiff cannot show that Captain Bufford or Interim Director Kitchen in his individual capacity were deliberately indifferent to the serious medical needs of Lason. Because Plaintiff cannot show that Defendants Bufford and Kitchen violated a constitutional right as required by prong one of the qualified immunity test, Defendants Bufford and Kitchen are entitled to qualified immunity on Plaintiff's deliberate indifference to serious medical needs claim.

As to Plaintiff's deliberate indifference to serious medical needs claim against Lieutenant McCollough, Officer Milhouse, Officer Coleman, and Sergeant Callahan, the Court found above that Plaintiff established a dispute of fact regarding their deprivation of Lason's constitutional rights. Therefore, prong one of the qualified immunity test is met for these Defendants. The Court must now, under prong two, determine whether that right was clearly established at the time of the alleged violation.

In *Scinto v. Stansberry*, an inmate had no access to water, was experiencing extreme stomach pain, and despite his distressed state and "several outward signs of his need for medical attention, including that his cell reeked to high heaven," the prison administrator "failed to provide Plaintiff with treatment or call for medical assistance." 841 F.3d 219, 231 (4th Cir. 2016). The

28

Fourth Circuit found that the prison administrator was not entitled to qualified immunity because a "prisoner's right to adequate medical care and freedom from deliberate indifference to medical needs has been clearly established by the Supreme Court and this Circuit since at least 1976 and, thus, was clearly established at the time of the events in question." *Id*. at 236. *See also*, e.g., *Estelle v. Gamble*, 429 U.S. 97 at 104–05 (1976) ("We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." (citation omitted) (quoting *Gregg v. Georgia*, 428 U.S. 153, 182–83 (1976))); *Farmer*, 511 U.S. at 832 ("[P]rison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care."); *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977) ("This circuit has consistently adhered to the prevailing view in requiring reasonable medical treatment [for inmates].") (citing authorities); *Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972) ("[W]here the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process."); *Riley v. Rhay*, 407 F.2d 496, 497 (9th Cir. 1969) ("While it is true that prison medical officials have wide discretion in treating prisoners, it is also well recognized that the failure or refusal to provide medical care may violate the Fourteenth Amendment.") (citation omitted). The Court finds that these cases clearly established that denial of medical attention to a prisoner seen lying naked and weak on the floor, struggling to speak and surrounded by trash and excrement, clearly violates the constitution. Accordingly, Lason's constitutional right to adequate medical care was clearly established at the time of the allegation. Therefore, Defendants Lieutenant McCollough, Officer Milhouse, Officer Coleman, Sergeant Callahan are not entitled to qualified immunity to the claims of deliberate indifference to Lason's serious medical needs.

29

Regarding the claims of deliberate indifference to Lason's conditions of confinement, the Court found above that Plaintiff cannot show that Captain Bufford or Officer Milhouse deprived his constitutional rights. Because Plaintiff cannot show that Defendants Bufford or Milhouse violated a federal right related to the conditions of his confinement, Defendants Bufford and Milhouse are entitled to qualified immunity on this claim.

As to Lieutenant McCollough, Officer Coleman, Sergeant Callahan, and Interim Director Kitchen in his individual capacity, the Court found above that Plaintiff has established a dispute of fact regarding Plaintiff's claims related to the conditions of his confinement. Therefore, prong one of the qualified immunity test is met for these Defendants. The Court must now determine, under prong two, whether that right was clearly established at the time of the alleged violation.

In *Taylor v Riojas*, an inmate brought a claim against prison officials alleging they were deliberately indifferent to his conditions of confinement because over six days, the inmate was confined to two unsanitary cells exposed to feces, extreme temperatures, and a broken toilet. 592 U.S. 7 (2020). The Supreme Court found that "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house Taylor in such deplorably unsanitary conditions for such an extended period of time." *Riojas*, 592 U.S. at 8-9. Like in *Riojas*, the summary judgment record in the case at hand does not "reveal any reason to suspect that the conditions of Taylor's confinement could not have been mitigated, either in degree or duration" 592 U.S. at 9. Here, for twelve days, Lason was confined to a pair of cells where he was exposed to feces, extreme temperatures, a broken toilet, as well as an alleged infestation of rats and bugs. Based on the Supreme Court's holding in *Taylor*, the Court finds that Lason's constitutional right to be free from such conditions of confinement was clearly established at the time of the allegation. Therefore, Defendants Lieutenant McCollough, Officer

Coleman, Sergeant Callahan, and Interim Director Kitchen in his individual capacity are not entitled to qualified immunity to the claims of deliberate indifference to Lason's conditions of confinement.

## IV.    Conclusion

In light of the foregoing, the Court **ADOPTS** as the order of the Court the following portions of the R & R: Sections 1, II(A), (B), (C), a portion of D(1) at 49-53, D(1)(i), and D(iii). The Court declines to adopt the balance of the R & R, as set forth above. Consequently, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 80), **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's claims for (1) deliberate indifference to Lason's serious medical needs against Captain Bufford and Interim Director Kitchen in their individual capacities; (2) deliberate indifference to Lason's serious medical needs against Interim Director Kitchen in his official capacity pursuant to *Monell*; (3) deliberate indifference to Lason based on his conditions of confinement against Captain Bufford and Officer Milhouse in their individual capacities; and (4) deliberate indifference to Lason based on his conditions of confinement against Interim Director Kitchen in his official capacity pursuant to *Monell*. (Dkt. No. 81).

Further, the Court **DENIES** Defendants' Motion for Summary Judgment as to Plaintiff's claims for (1) deliberate indifferent to Lason's serious medical needs against Lieutenant McCollough, Officer Milhouse, Officer Coleman, and Sergeant Callahan in their individual capacities; (2) deliberate indifference to Lason's serious medical needs against Richland County pursuant to *Monell*; (3) deliberate indifference to Lason based on his conditions of confinement against Lieutenant McCollough, Officer Coleman, Sergeant Callahan, and Interim Director Kitchen in their individual capacities; and (4) deliberate indifference to Lason based on his conditions of confinement against Richland County pursuant to *Monell*. (Dkt. No. 81).

Lastly, Plaintiff's claims for punitive damages against Richland County are **DISMISSED**.

**AND IT IS SO ORDERED.**


        _s/Richard M. Gergel_
        Richard Mark Gergel
        United States District Judge

March 24, 2025
Charleston, South Carolina